# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| JAMES ALLYSON LEE, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| vs. | * | CV 510-017 |
| | * | |
| CARL HUMPHREY, Warden, | * | |
| Georgia Diagnostic Prison, | * | |
| | * | |
| Respondent. | * | |

## ORDER

Presently before the Court is Petitioner's Motion for Leave to Conduct Discovery. See Dkt. No. 48. Upon due consideration, Petitioner's motion is **GRANTED IN PART** and **DENIED IN PART**.

I.  BACKGROUND

After a jury trial in the Superior Court of Charlton County, Georgia, Petitioner was convicted of malice murder, felony murder, armed robbery, and possession of a firearm during the commission of a crime in connection with the May 1994 homicide of Sharon Chancey ("Chancey murder"). Dkt. No. 10-6, at 3.

1

AO 72A
(Rev. 8/82)

Following the sentencing phase of trial, the jury found that several aggravating circumstances existed and recommended a sentence of death. Id. at 4-5. Accordingly, in June 1997, the trial court sentenced Petitioner to death for the murder; life imprisonment for the armed robbery; and five (5) years for possession of a firearm during the commission of a felony. Id. at 6-9.

Petitioner filed a motion for new trial and later amended that motion. Id. at 10, 20-24. Following a hearing, Petitioner's amended motion for a new trial was denied. Id. at 33. The Georgia Supreme Court affirmed Petitioner's convictions and his sentence of death. Lee v. State, 514 S.E.2d 1 (Ga. 1999); Dkt. No. 12-16. Thereafter, the United States Supreme Court denied Petitioner's petition for writ of certiorari. Lee v. Georgia, 528 U.S. 1006 (1999), rehearing denied, 528 U.S. 1125 (2000); Dkt. Nos. 13-2; 13-4.

In August 2000, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County, Georgia ("state habeas court"). Dkt. No. 13-5. In April 2001, Petitioner amended that petition. Dkt. No. 13-11. In total, Petitioner's state habeas petition had twelve (12) grounds for relief, including the two (2) grounds for which Petitioner now seeks

discovery. See Dkt. No. 20-16, at 3. In August 2001, the state habeas court conducted an evidentiary hearing. See Dkt. Nos. 14-2 through 20-5. That "hearing focused on [Petitioner's] claims of ineffective assistance of counsel with respect to trial counsel's penalty phase preparation and presentation." Dkt. No. 20-16, at 2. In March 2009, the state habeas court granted relief regarding Petitioner's sentence of death, concluding that trial counsel had provided ineffective assistance during the sentencing phase of Petitioner's death penalty trial. See Dkt. No. 20-16.

The Supreme Court of Georgia reversed the state habeas court's grant of relief and reinstated Petitioner's death sentence. Hall v. Lee, 684 S.E.2d 868 (Ga. 2009); Dkt. No. 20-28.

In February 2010, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. See Dkt. No. 1. In September 2010, Petitioner amended his petition. See Dkt. No. 29. In December 2012, this Court held a hearing regarding Respondent's assertion that several of Petitioner's claims were procedurally defaulted. Petitioner withdrew many of his claims. Of the claims that were not withdrawn, the parties agreed that all claims other than paragraph 21 of Claim 2 and paragraph 29

3

of Claim 5 were ripe for resolution on the merits. The parties further agreed to brief their arguments regarding the procedural default of these claims in their merits briefs, after resolution of any motions for discovery or an evidentiary hearing. See Dkt. No. 44.

Presently before the Court is Petitioner's motion for leave to conduct discovery on two (2) issues in his federal habeas petition. See Dkt. No. 48. The motion is fully briefed. See Dkt. Nos. 51, 52.

## II. LEGAL STANDARD

A. Requests for Discovery

"A habeas petitioner[] . . . is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997). However, pursuant to Rule 6 of the Rules Governing § 2254 Cases ("Rule 6"), the court may authorize a party to conduct discovery upon a showing of "good cause."[1]

---

[1] Respondent cites Arthur v. Allen, 452 F.3d 1234, 1247 (11th Cir. 2006), for the proposition that Petitioner must show "good cause" and "diligence in pursuing the claim for which discovery is sought." See Dkt. No. 51, at 5. However, the rule articulated by the court in Arthur was modified upon rehearing. See Arthur v. Allen, 459 F.3d 1310 (11th Cir. 2006) (per curiam).

4

28 U.S.C. Section 2254 Rule 6; see also Bracy, 520 U.S. at 904. In so doing, the court "may limit the extent of discovery." 28 U.S.C. § 2254 Rule 6.

Good cause is demonstrated "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520 U.S. at 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300 (1969)) (ellipses in original). "[G]ood cause for discovery cannot arise from mere speculation" or "pure hypothesis." Arthur v. Allen, 459 F.3d 1310, 1311 (11th Cir. 2006) (per curiam), modifying Arthur v. Allen, 452 F.3d 1234, 1247-48.

In addition to showing "good cause" for discovery, a petitioner must show that he exercised reasonable diligence in attempting to obtain the sought-after discovery in state court. See Isaacs v. Head, 300 F.3d 1232, 1248-49 (11th Cir. 2002) (interpreting the language of 28 U.S.C. § 2254(e)(2) to create a due diligence requirement for discovery and evidentiary hearings); id. at 1249-50 (upholding the district court's denial

---

Consequently, Respondent's reliance on that portion of the Arthur opinion is misplaced.

of the petitioner's request for discovery for "lack of diligence during the state court proceedings"); Crawford v. Head, 311 F.3d 1288, 1329 (11th Cir. 2002) (upholding district court's denial of the petitioner's request for discovery for "fail[ing] to exercise sufficient diligence in seeking [the requested items] while in state court").

B. Requests for Financial Assistance

Requests for financial assistance for investigators or experts are governed by 18 U.S.C. § 3599(f). Section 3599(f) provides

> Upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses therefor under subsection (g).

The Eleventh Circuit interpreted the phrase "reasonably necessary" to mean "the same as showing a 'substantial need' for the requested assistance." Gary v. Warden, Ga. Diagnostic Prison, 686 F.3d 1261, 1268 (11th Cir. 2012) (citation omitted).

If a petitioner has not shown good cause for the discovery that he requests, he is not entitled to an investigator to

6

conduct the discovery or any experts to interpret the results of the discovery.

### III.  DISCUSSION

Petitioner requests discovery for two (2) claims previously presented to the state courts.  First, Petitioner seeks discovery related to his claim that the State suppressed material exculpatory and impeachment evidence.  See Dkt. No. 48, at 1.  Second, Petitioner seeks discovery related to his claim that his death sentence is disproportionate in light of aggravating and mitigating evidence.  See id.  For the reasons stated below, Petitioner's requests for discovery are **GRANTED IN PART** and **DENIED IN PART**.

A. Suppressed Evidence

Petitioner seeks discovery related to his claim that the State suppressed specific impeachment evidence.  See Dkt. No. 48, at 1.  For the reasons stated below, Petitioner's discovery request with respect to this claim is **GRANTED**.

1.  Background

Two people spent significant time with Petitioner on the night that he committed the offenses underlying his convictions.

7

These people were positioned to observe Petitioner's behavior before and after the armed robbery and murder. In particular, Leaundry Carter spent many hours with Petitioner before the murder. See Dkt. No. 14-5, at 82-85. During this time, Carter and Petitioner ingested an assortment of unknown, and unprescribed, prescription pills. See id. They also consumed a large quantity of alcohol. See id. As a result of their drug and alcohol consumption, both Carter and Petitioner felt "real weird . . . more than just [] high or drunk." Id.

Later that night, Petitioner's co-defendant, Shannon Yeoman, rode around with Petitioner and was with him when he committed the armed robbery and murder. See Dkt. No. 14-6, at 40-45. She observed that Petitioner was "hyper and stressed out," "hyper and nervous," in a "frenzy," impulsive, and not in "control of himself." See id. at 42-43. She also noted that she had never observed Petitioner "act or look like he did that night." See id. at 43.

Both Carter and Yeoman asserted that they provided law enforcement officers details of Petitioner's drug and alcohol use and his mental and physical demeanor before and during the crimes' commission. See Dkt. Nos. 14-5, at 82-85; 14-6, at 40-45. Carter asserted that he relayed his observations to Georgia

8

Bureau of Investigation ("GBI") agents some time after the night in question. See Dkt. No. 14-5, at 84. Carter also asserted that he spoke with Toombs County police officers. Id. Yeoman asserted that she relayed her observations to GBI agents and Florida officers. See Dkt. No. 14-6, at 44.

According to Petitioner's trial counsel, the district attorney represented that he maintained an "open file" policy. See Dkt. No. 14-7, at 71. Even after reviewing the district attorney's file, Petitioner's trial counsel were unaware that Carter had spoken with law enforcement regarding the case. In fact, they remained unaware of Carter's purported discussions with law enforcement until nearly three (3) years after Petitioner's sentencing. See id. at 68-81.

In January 2001, Petitioner moved the state habeas court to order the State to disclose all Brady[2] material. See Dkt. No. 52-1. In early May 2001, Carter and Yeoman signed affidavits attesting to (1) their observations on the night of Petitioner's crimes and (2) their relay of those observations to various law enforcement officials shortly after Petitioner committed the crimes. See Dkt. Nos. 14-5, at 82-85; 14-6, at 40-45. In late

---

[2] See Brady v. Maryland, 373 U.S. 83 (1963).

9

May 2001, Petitioner's trial counsel signed affidavits attesting to (1) the district attorney's representation that he maintained an open file policy and (2) the fact that a review of that file left them unaware that Carter and Yeoman had provided statements to law enforcement officials. See Dkt. No. 14-7, at 68-81.

After the above-mentioned affidavits were signed, Petitioner again moved the state habeas court to order the district attorney "to disclose all withheld documents not protected by the work product privilege, produce a privilege log to counsel for [Petitioner,] and produce any withheld portions of the files to the [state habeas court] for an in camera inspection so that the [state habeas court] could . . . review such documents for Brady material."[3]  See Dkt. No. 52-3, at 5-6.

In early July 2001, the GBI special agent in charge of the GBI's investigation into the Chancey murder signed an affidavit attesting that "no one from the GBI ever interviewed [] Carter in reference to the Chancey murder, the [robbery], or any other matter." Dkt. No. 19-1, at 2-3.

---

[3] Petitioner made his motion after requesting materials pursuant to Georgia's Open Records Act, O.C.G.A. § 50-18-70 et seq., and after attempting to subpoena such files from the district attorney. See Dkt. No. 52-3.

In late July 2001, following the evidentiary hearing, the state habeas court ordered the district attorney to produce "for an *in camera* inspection, all documents, notes and other matters in his possession which were previously not produced to Petitioner or his agents pursuant to prior [] subpoena or open records actions and which relate in any manner to the prosecution of Petitioner for the offense of murder out of which this action arises." Dkt. No. 13-19.

After the state habeas court's order compelling production, the district attorney responded to Petitioner's motion to compel. See Dkt. No. 52-4. In his response, the district attorney attached documents to which he waived work product privilege. See id. ¶ 2. The district attorney agreed to make all remaining documents available to the state habeas court for *in camera* inspection. See id. ¶ 4. The district attorney did not produce a privilege log of those files to which the district attorney asserted a work product privilege. See id.

The record does not clarify precisely what occurred after the district attorney filed his opposition brief. However, the reasonable inference from the record is that the state habeas court conducted an *in camera* inspection of all files to which the district attorney claimed work product privilege. See Dkt.

11

No. 13-20 (noting that the state habeas court reviewed files "pursuant to an Order for an *in camera* review"). It appears that the only document produced for *in camera* inspection was the district attorney's trial book. See id. After the state habeas court's review, that court ordered that certain portions of the district attorney's trial book be disclosed. See Dkt. No. 14-1.

After an evidentiary hearing and post-hearing briefing, the state habeas court found, without written analysis, that Petitioner's claim that the prosecution failed to disclose relevant Brady material was procedurally defaulted for failure to establish cause and prejudice. See Dkt. No. 20-16, at 4, overturned on other grounds by Hall v. Lee, 684 S.E.2d 868 (Ga. 2009); Dkt. No. 20-28.

2.  Application

Petitioner has provided—through the affidavits of Carter, Yeoman, and his trial counsel—specific allegations that the district attorney failed to disclose information related to law enforcement encounters with the best witnesses to Petitioner's intoxication and mental state before and during his crimes. These affidavits provide more than mere speculation as to the existence of such evidence. Moreover, should discovery prove

12

the veracity of these affidavits, there is "reason to believe that [Petitioner] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." Bracy, 520 U.S. at 908-09 (quoting Harris, 394 U.S. at 300) (ellipses in original). Specifically, should evidence consistent with these affidavits be disclosed, Petitioner "may" be able to show that the penalty phase of his trial would have resulted in a different outcome given the mitigating power of Petitioner's allegedly compromised mental state prior to and during his crimes.

Because there is "reason to believe" that, upon full development of the alleged facts, Petitioner "may" be able to show that he is entitled to relief from his death sentence, there is good cause for granting Petitioner's discovery request. Moreover, because Petitioner sought information related to law enforcement encounters with Carter and Yeoman in the state habeas court, Petitioner exercised due diligence in seeking the currently-requested discovery. Consequently, Petitioner's motion to compel discovery on this claim is **GRANTED.**

Accordingly, it is **ORDERED** that all documents, notes, and other matters in the prosecutor's possession which were not previously produced to Petitioner or his agents pursuant to

13

prior subpoena, open records actions, or court orders and which relate in any manner to interviews, interrogations, or conversations between Leaundry Carter and/or Shannon Yeoman and the prosecutor, his agents, and/or any law enforcement officers or agencies and that took place after the commission of the crimes at issue in this case but before Petitioner's sentencing be produced within thirty (30) days of this Order. If requested, the Court will conduct an *in camera* review of any disclosed materials to determine whether further disclosure is warranted.

B. Proportionality of Death Sentence

Petitioner seeks discovery related to his claim that his death sentence is disproportionate in light of aggravating and mitigating evidence. See Dkt. No. 48, at 1. For the reasons stated below, Petitioner's motion to conduct discovery on this claim is **DENIED**.

1. Legal Standard

Georgia law requires the Supreme Court of Georgia to review a death sentence to determine whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases,

14

considering both the crime and the defendant." O.C.G.A. § 17-10-35(c)(3).

The United States Supreme Court has held that the U.S. Constitution does not require a proportionality review. See Pulley v. Harris, 465 U.S. 37 (1984); see also id. at 46, 50 (noting that, while the court in Gregg v. Georgia, 428 U.S. 153 (1976), "emphasiz[ed] the importance of mandatory appellate review under the Georgia statute, [it] did not hold that without comparative proportionality review the statute would be unconstitutional" (citing Zant v. Stephens, 462 U.S. 862, (1983))); McClesky v. Kemp, 481 U.S. 279, 306-307 (1987) (holding that "absent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, [the petitioner] could not prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty").

The Eleventh Circuit has also addressed the role of state requirements of proportionality in federal habeas proceedings. Importantly, the Eleventh Circuit has "instructed district courts to refuse [] requests [for proportionality review] when deciding habeas corpus petitions." Mills v. Singletary, 161 F.3d 1273, 1282 (11th Cir. 1998) (per curiam); see also Moore v.

15

Balkcom, 716 F.2d 1511, 1518 (11th Cir. 1983) ("A federal habeas court should not undertake a review of the state supreme court's proportionality review . . . ."). In so doing, the Eleventh Circuit stated

> The Constitution does not require a proportionality review. And [the Eleventh Circuit] refuse[s] to mandate as a matter of federal constitutional law that where, as here, state law requires such review, courts must make an explicit, detailed account of their comparisons. Based on their own past experience in reviewing capital punishment cases, state appellate courts "can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not," without listing in their opinions the facts that did or did not justify the imposition of the death penalty in the prior cases.

Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) (internal citations omitted).

    2.    Application

Proportionality review is not required by the U.S. Constitution or any other federal law. Moreover, Eleventh Circuit precedent forbids a case-by-case comparison of the review undertaken by the Supreme Court of Georgia. Consequently, Petitioner's request for discovery on this issue is **DENIED**.

AO 72A
(Rev. 8/82)

**IV.   CONCLUSION**

For the reasons stated above, Petitioner's Motion for Leave to Conduct Discovery is **GRANTED IN PART** and **DENIED IN PART**. Dkt. No. 48.  Petitioner's request for discovery on his claim that his death sentence is disproportionate is **DENIED**. Petitioner's request for discovery related to his Brady claim is **GRANTED** as outlined in Part III.A.2.

Petitioner's request for necessary expert and investigative services is **DENIED**.  If material produced as a result of this Order renders such services necessary, Petitioner should refile his motion.

**SO ORDERED**, this 20th day of August, 2013.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

17